1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10   BERNARD C. HUGHES,                    No.  1:14-cv-01237-LJO-SKO  HC

11              Petitioner,               **FINDINGS AND RECOMMENDATION
                                          THAT COURT DENY PETITION FOR
12      v.                                WRIT OF HABEAS CORPUS**

13   MARTIN BITER, Warden,

14              Respondent.                **(Docs. 1, 34, and 35)**

15
16        Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.

18   **I.    Factual Background[1]**

19        **A.    Prosecution's Case**

20        At about 3:00 p.m. on May 1, 2008, Bill and Janet Whitla returned from vacation to their

21   ranch near Hornitas, California (Mariposa County).  As they drove into the property, the Whitlas

22   saw an unfamiliar Chevy flatbed truck next to their garage.  Janet Whitla recognized Petitioner as

23   the driver.  Petitioner said, "Rick," and twice pointed toward the house before driving away.  As

24   he left, Janet saw some of Bill's equipment on Petitioner's truck bed.  Bill turned his truck around

25   and followed Petitioner.

26

27
---
28   [1] The factual background is derived from *People v. Hughes*, 2013 WL 2103414 (Cal.App. May 16, 2013) (No.
     F061613).

1

The Whitlas eventually encountered Petitioner's truck abandoned on the side of the road and used their truck's OnStar security system to call the Sheriff's Department. While the Whitlas were speaking with the OnStar operator, Petitioner's girlfriend, Tami Turner, drove up. In response to Janet's questions, Turner confirmed that the truck belonged to Petitioner but insisted that Janet could not have seen Petitioner driving it since he had been home in bed with her. Janet did not argue with Turner, who appeared intoxicated. Turner left.

When sheriff's deputies arrived, the Whitlas identified a number of items on the truck as having been taken from their house and garage, including an air compressor, a generator, jewelry valued at $2000, a loaded Colt pistol, and various other personal items. Deputies searched the cab and found bolt cutters, a pry bar, and leather gloves with fresh sweat stains. Later forensics testing confirmed that the bolt cutter had been used to cut the chain that connected the air compressor and generator to the Whitlas' garage wall. The gloves yielded a partial DNA sample consistent with Petitioner's DNA.

Deputies determined that the burglar entered the Whitlas' home through the open garage. They concluded that the burglar had removed the screen from the door to the house, reached inside, and disengaged the door lock, possibly by using a pry bar.

After investigating the Whitlas' home, deputies went to Turner's home to look for Petitioner. Petitioner was not there. Turner and the Whitlas' ranch caretaker, Rick Skavdahl, were there together; both were intoxicated.

Skavdahl lived in a trailer on the Whitlas' ranch. Before leaving on vacation, the Whitlas told Skavdahl of their plan to return on May 3, 2008. When they returned home early on May 1, they saw and waved to Skavdahl while they picked up their mail in Hornitas before heading out to the ranch.

///

2

The next day, the Whitlas found a cigarette butt on the garage floor and secured it in a sealed envelope.  Janet delivered the envelope to the sheriff's office in Mariposa.  DNA extracted from the cigarette butt matched Petitioner's DNA.

Petitioner was not apprehended until May 30, 2008.  Deputies found him under the bed in Turner's master bedroom.  Behind Turner's front door, near the door to the bedroom, deputies found a 30/30 rifle in a scabbard.  In the living room, deputies found a box containing documents and a suitcase, both belonging to Petitioner.  A white Dodge Caliber was found parked behind Turner's house: a folder and prescription bottle bearing Petitioner's name were inside.  Petitioner had the key to the Dodge in his pocket when he was arrested.

The Dodge had a Kansas license plate that had been issued to another vehicle.  The Dodge's vehicle identification number indicated that it was owned by a Los Angeles car rental company.  At trial, the parties stipulated that the rental company had reported the Dodge stolen on May 11, 2008.

Petitioner's comments were recorded during the ride to jail.  With regard to the rifle, Petitioner said, "I seen a coyote the other night fucking coming up to get the chickens . . . [s]o I took a pretty good shot at him."

Petitioner admitted that he knew the Dodge was stolen.  During a sheriff's department interview, Petitioner explained that he had borrowed the Dodge from a friend and had planned to return it.  When Turner told him the car had been reported stolen, however, Petitioner decided to keep it since he needed a vehicle.  He obtained the Kansas plate from a friend to replace the California plates that had been on the Dodge.

Lillian Donato, who had been Turner's friend, testified that Turner provided her with beer to induce her to lie and tell defense counsel that she had seen someone other than Petitioner getting out of the truck near Hornitos.

3

The parties stipulated that Petitioner was a convicted felon before May 1, 2008.

**B.     Defense Case**

Petitioner conceded his ownership of the flatbed truck used in the burglary and the Whitlas' ownership of the property found on it, but denied committing the May 1, 2008, burglary. He maintained that Janet Whitla, who admittedly had only seen the driver for a few seconds, misidentified Petitioner as the truck's driver.  In his testimony, Charles Cahoone, the defense investigator, contrasted Janet's initial description of the driver with details she added in later interviews and her trial testimony.  The defense also presented expert testimony regarding problems associated with perception, memory, and eyewitness identification.

Cahoone testified that when he interviewed Donato in 2008 and 2009, she told him that she saw Petitioner's truck near the Whitla ranch and saw someone other than Petitioner get out of the driver's door.  The person Donato saw was a short, heavy-set White male with short spiked hair.  Cahoone never heard the claim that Turner had bribed Donato to give a false alibi until he interviewed Donato in April 2010.

Defense experts testified that DNA testing excluded Petitioner as a contributor to DNA samples extracted from a sweatshirt found in the truck and a beanie found in the Whitlas' garage after the burglary.

Turner testified that she and Petitioner awoke early on May 1, 2008, to spray thistle.  They returned to the house and were sitting outside when Skavdahl and Humberto "Cheeto" Arteaga stopped by.  After Skavdahl and Arteaga left, Turner and Petitioner went to bed, had sex, and fell asleep.  Turner woke up to the sound of Petitioner's truck.  She ran outside, saw the truck going up the road, dressed, and set out in her car to follow the truck.  She found it crashed into a bank with the Whitlas parked behind it.  Turner told them that it was Petitioner's truck but that he was still home in bed.

Turner returned home, woke Petitioner, and told him that the sheriff was coming because his truck had been used in a burglary. Petitioner said he was not going back to jail for something he didn't do and ran off. He did not return to Turner's home until May 30, 2008.

Turner denied that she tried to bribe Donato to say she saw someone else driving Petitioner's truck. She also dismissed Petitioner's claim that he had shot a coyote with the 30/30 rifle in her home. Turner testified that the rifle had belonged to her father and that she had no ammunition for it in her home.

**II.     Procedural Background**

In January 2010, Petitioner filed a complaint and an emergency grievance with the Mariposa County Sheriff's Department concerning the prison administration's ability to monitor his conferences with his attorney in the prison visiting room, which was not soundproof. On January 13, 2010, the sheriff found that the complaint did not meet the requirements for an emergency grievance but directed that adjacent phones and speakers be turned off during Petitioner's meetings with his attorney.

In May 2010, Petitioner was tried in Mariposa County Superior Court. A jury convicted him of (1) residential burglary (Cal. Penal Code § 459), (2) two counts of being a felon in possession of a firearm (Cal. Penal Code § 12021(a)(1)), (3) being a felon in possession of ammunition (Cal. Penal Code § 12315(b)(1)), (4) receiving stolen property (Cal. Penal Code § 496(a)),and (5) falsifying a license plate (Cal. Vehicle Code § 4463(a)(1)). The trial court found true allegations that Petitioner had two prior serious felony convictions (Cal. Penal Code § 667(a)(1)), two prior strike convictions (Cal. Penal Code §§ 667(b)-(i) and 1170.12(a) and (d)), and four prison terms (Cal. Penal Code § 667.5(b)). The court sentenced Petitioner to an aggregate prison term of 88 years to life.

///

5

Petitioner filed a direct appeal to the California Court of Appeals.  In a May 16, 2013, decision, the court of appeals affirmed Petitioner's convictions but remanded for sentence modification.  The California Supreme Court denied the petition for review on September 11, 2013.

In January 2014, Petitioner filed a writ of habeas corpus with the Mariposa County Superior Court.  On February 6, 2014, the superior court denied the petition, finding that it failed to establish a prima facie case for relief.  The Court of Appeal summarily denied the petition on March 14, 2014; the California Supreme Court summarily denied the petition on June 18, 2014.

On August 7, 2014, Petitioner filed a habeas petition pursuant to 28 U.S.C. § 2254.  On April 30, 2015, the Court dismissed two state claims over which it had no jurisdiction.[2]

## III.   **Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

---

[2] The findings and recommendations (Doc. 9) misidentified the second dismissed claim as count nine.  Context indicates that the Court intended to dismiss claims three and eight.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

## IV.  <u>Motion for Expansion of Record</u>

Petitioner moves to expand the record (Doc. 34) to include (1) confidential communication between the jail commander and the court (pages 2706A and 2707) and (2) pages 1101-1102 of Day 8 of the jury trial, which includes a statement from defense counsel to the jury that "he decides whether Petitioner is to take [the] stand."  Beyond stating that the these pages are not included in the state court record, Petitioner offers no explanation of his need for these supplementary materials.

Respondent has already filed the state court record in this case.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  The Court should, therefore, deny Petitioner's motion for expansion of the record.

## V.  <u>Motion for Evidentiary Hearing</u>

Arguing that the record is insufficient to support his federal habeas claims, Petitioner moves for an evidentiary hearing to explore further the various grounds he advances for habeas relief.  Petitioner also proposes to use the evidentiary hearing to further argue the application of numerous documents included within the state record.

"Habeas is an important safeguard whose goal is to correct real and obvious wrongs.  It was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'"  *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (quoting *Calderon v. United States District Court for the Northern District of California (Nicolaus)*, 98 F.3d 1102,

1106 (9ᵗʰ Cir. 1996).  Habeas petitioners are not routinely entitled to discovery.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  The discovery provisions of the Federal Rules of Civil Procedure do not generally apply in habeas cases.  *Harris v. Nelson*, 394 U.S. 286, 295 (1969).  *See* Rule 6(a) of the *Rules Governing § 2254 Cases* ("A judge may, for good cause, authorize a party to conduct discovery under the federal Rules of Civil Procedure and may limit the extent of discovery").

Section 2254(e)(2) of AEDPA bars most evidentiary hearings if the applicant "failed" to develop the factual basis for the claim in state court.  In this context, "failed" "connotes some omission, fault, or negligence on the part of the person who has failed to do something." *Williams*, 529 U.S. at 431-32.  "Under § 2254(e)(2), a petitioner who failed to develop the facts of the claim in state court may not obtain a hearing in federal court except in limited circumstances."  *See, e.g., Atwood v. Schriro*, 489 F.Supp.2d 982, 1007 (D.Ariz. 2007).  If the court determines that the applicant failed to develop the factual basis for a claim in state court, the district court can hold an evidentiary hearing only if the petitioner meets two demanding requirements: (1) the allegations, if proven, would entitle the petitioner to relief and (2) the state court trier of fact has not reliably found the relevant facts.  *Rich*, 187 F.3d at 1068.  A habeas petitioner who has failed to develop a factual basis for his claims in state court and requests an evidentiary hearing before a federal district court must demonstrate that "the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of diligence and . . . the facts underlying the claim would . . .establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).

"[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

*Williams*, 529 U.S. at 432.  "A petitioner has not neglected his or her rights in state court if diligent in efforts to search for evidence."  *Bragg v. Galaza*, 242 F.3d 1082, 1090, amended by 253 F.3d 1150 (9th Cir. 2001).

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts.  The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence.  Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful.
>
> *Williams*, 529 U.S. at 435.

Petitioner does not argue that good cause entitles him to pursue discovery but simply assumes that he is entitled to an evidentiary hearing to buttress his many claims.

A habeas petitioner may not presume entitlement to an evidentiary hearing, discovery, or both.  *Bracy*, 520 U.S. at 903-05.  "The mere request for an evidentiary hearing may not be sufficient to establish diligence if a reasonable person would have taken additional steps."  *Atwood*, 489 F.Supp.2d at 1007.  *See also Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003) (finding lack of diligence despite request for evidentiary hearing when the petitioner made no effort to develop the record or to assert facts supporting ineffective assistance of counsel claim); *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (finding the petitioner not to have been diligent when he failed to secure affidavits of family members that were easily obtained without a court order and at reasonable expense).

Nothing in the record suggests that Petitioner ever sought an evidentiary hearing or additional discovery in the course of his habeas proceedings in state court.  To the contrary, the state petitions alleged that the claims were supported by the existing record.  The Court should decline to conduct an evidentiary hearing and proceed to resolve the petition on its merits.

## VI.   Due Process: Denial of Access to DNA Evidence

Petitioner claims violation of his due process rights arising from the trial court's failure to order the prosecution to identify the individual whose DNA was identified on the beanie

1   recovered from the Whitlas' garage after the burglary.  Petitioner contends that the trial court

2   should have ordered the prosecution both to upload the DNA profile to CODIS for potential

3   matching and to compare the DNA profile from the beanie to the DNA profile for Humberto

4   "Cheeto" Arteaga in California's state DNA database.

5       Petitioner first raised this claim in his state petition for writ of habeas corpus, contending

6   that the prosecution violated his rights by suppressing exculpatory evidence.

7       Describing the claim as "vague references to a failure of the prosecution to produce

8   exculpatory 'DNA evidence' to the defense, the Mariposa County Superior Court denied it, along

9   with the other habeas claims, as conclusory and insufficient to constitute a *prima facie case* for

10  relief.  *See Lodged Doc.* 8 at 2-3.[3]  Thereafter, the California Court of Appeals and Supreme

11  Court summarily denied petitions for habeas corpus.

12      The prosecution's suppression of evidence favorable to an accused violates due process if

13  the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of

14  the prosecution.  *United States v. Agurs*, 427 U.S. 97, 107 (1976); *Brady v. Maryland*, 373 U.S.

15  83, 87 (1963).  Although Petitioner characterizes this claim as the prosecution's having withheld

16  exculpatory evidence, this is not accurate.  The failure of DNA testing to link the beanie to

17  Petitioner was the exculpatory evidence.  The prosecution fully disclosed to Petitioner that the

18  DNA samples derived from the beanie were not consistent with Defendant's DNA.  That

19  evidence was introduced at trial.  Petitioner fully received the due process he was entitled to with

20  regard to the disclosure of exculpatory DNA evidence.

21      In this claim, however, Petitioner contends that he was entitled to more than disclosure

22  and presentation of the exculpatory evidence: he argues that he was entitled to a comparison of

23  the DNA evidence with DNA samples included within CODIS (Combined DNA Index System)

24  and the California DNA Database to identify whose DNA was consistent with the samples

25  derived from the beanie.  Petitioner speculates that the beanie could be linked to Arteaga, but

26  presents no reasoned factual basis supporting the speculation.  Because Arteaga had previously

---

27  [3] Because both the California Court of Appeals and Supreme Court summarily denied review, the Court must "look
28  through" the summary denial to the last reasoned decision, which is, in this case, the opinion of the Mariposa County
Superior Court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).

1    worked at the Whitlas' ranch, even if his DNA had been identified on the beanie discovered in the

2    garage after the burglary, that evidence alone would not be sufficient to link Arteaga to the

3    burglary.

4         The state court reasonably concluded that the prosecution did not fail to disclose

5    exculpatory evidence to Petitioner.

6    **VII.   Due Process: Exclusion of Evidence Supporting Third-Party Culpability Defense**

7         Petitioner contends that his Fourteenth Amendment right to due process was violated

8    when the trial court excluded the items of evidence supporting his defense that a third party

9    committed the burglary: (1) Turner's testimony that Arteaga had asked to use Petitioner's truck

10   on the morning of the burglary; (2) evidence of the earlier burglary of another residence on the

11   Whitla ranch; and (3) testimony of three inmates to whom Skavdahl made statements implicating

12   someone other than Petitioner.

13        **A.       Evaluation of State Court Evidence Rulings, in General**

14        Issues regarding the admission of evidence are matters of state law, generally outside the

15   purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

16   On federal habeas review, the sole issue is whether or not the state proceedings satisfied due

17   process. *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). The Due Process Clause

18   neither permits the federal courts to engage in a finely tuned review of the wisdom of state

19   evidentiary rules nor does it guarantee the right to introduce all relevant evidence. *Montana v.*

20   *Egelhoff*, 518 U.S. 37, 42 (1996); *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983). A trial

21   court's exclusion of evidence does not violate the Due Process Clause unless "it offends some

22   principle of justice so rooted in the traditions and conscience of our people as to be ranked as

23   fundamental." *Patterson v. New York*, 432 U.S. 197, 201-02 (1977).

24        One of the fundamental rights that may be violated by the erroneous exclusion of evidence

25   is the right to present a defense guaranteed by the Sixth Amendment. *De Petris v. Kuykendall*,

26   239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973),

27   and *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)). Under California law, third-party

28   culpability evidence is evaluated using the same evidence rules applicable to other evidence.

1    *People v. Hall*, 41 Cal. 3d 826, 834 (1986).   In evaluating on direct appeal the claimed violation

2    of Petitioner's right to present a third-party culpability defense, the Court of Appeal relied on

3    *Holmes v. South Carolina* (547 U.S. 319, 324-25 (2006)) for the proposition that the U.S.

4    Constitution grants states broad latitude to establish evidence rules for excluding evidence in

5    criminal trials.   *Hughes*, 2013 WL 2103414 at *10.

6    **B.        Standards for Reviewing Third-Party Culpability Evidence**

7          In *Holmes*, the U.S. Supreme Court reversed and remanded a decision of the South

8    Carolina Supreme Court.   The South Carolina court held that a trial court could exclude all

9    evidence tending to show commission of the crime by another person "where there is strong

10   evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered

11   evidence about a third party's alleged guilt may (or perhaps must be) excluded."   547 U.S. at 329

12   (internal quotes omitted).   The U.S. Supreme Court held that state courts cannot determine the

13   admissibility of third-party culpability evidence by weighing the evidence supporting the

14   accused's guilt.   In doing so, it "did not depart from the rule that state lawmakers have broad

15   latitude in establishing rules of evidence so long as they do not infringe upon a weighty interest of

16   the accused and are [neither] arbitrary [n]or disproportionate to the purposes they are intended to

17   serve."   *Duvardo v. Giurbino*, 649 F.Supp.2d 980, 1007 (N.D.Cal. 2009).

18        The *Holmes* Court began its analysis by citing legal encyclopedias to recall the basic

19   evidentiary rules concerning admission of third-party culpability evidence:

20   
21                    Evidence tending to show the commission by another person of the
                    crime charged may be introduced by [the] accused when it is
                    inconsistent with, and raises a reasonable doubt of, his own guilt;
22                  but frequently matters offered in evidence for this purpose are so
                    remote and lack such connection with the crime that they are
23                  excluded.

24                  *Holmes*, 547 U.S. at 327 (quoting 41 C.J.S., Homicide § 216 at 56-
                    58 (1999)).

25                  The accused may introduce any legal evidence tending to prove that
                    another person may have committed the crime with which the
26                  defendant is charged . . . [Such evidence] may be excluded where it
                    does not sufficiently connect the other person to the crime, as, for
27                  example, where the evidence is speculative or remote, or does not
                    tend to prove or disprove a material fact in issue at the defendant's
28                  trial.

                                              13

*Holmes*, 547 U.S. at 327 (quoting 40A Am.Jur.2d, Homicide § 286 at 136-38 (1999)).

When challenging exclusion of evidence intended to prove third-party culpability, "[t]he defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule 'is so rooted in traditions and conscience of the people as to be ranked as fundamental.'"  *Morales v. Scribner*, 621 F.Supp.2d 808, 819-20 (N.D.Cal. 2008) (quoting *Egelhoff*, 518 U.S. at 47).  "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Egelhoff*, 518 U.S. at 42 (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).  For example, hearsay rules appropriately "prohibit the introduction of testimony which, although unquestionably relevant, is deemed sufficiently unreliable." *Egelhoff*, 518 U.S. at 42.  A petitioner's right to present a defense should not be construed to permit the petitioner to "constitutionalize" claims arising from compliance with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *United States v. Waters*, 627 F.3d 345, 353 (9th Cir. 2010) (quoting *United States v. Perkins,* 937 F.2d 1397, 1401 (9th Cir. 1991)).

In *Morales*, the district court restated the elements for analyzing a petitioner's claim that exclusion of evidence violated his due process rights:

> In deciding whether the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the Court balances five factors:  (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000).  The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based.  *See Chia*, 360 F.3d at 1006; *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985).  Even if exclusion of the evidence amounts to constitutional error, in order to justify federal habeas relief, the erroneous exclusion must have had "a substantial and injurious effect" on the verdict.  *Brecht [v. Abrahamson*, 507 U.S. 619, 623 (1993).]  Habeas petitioners must therefore establish that the error resulted in "actual" prejudice.  *See id.*

*Morales*, 621 F.Supp.2d at 820.

*///*

14

1    The *Morales* decision illustrates the application of these general rules in analyzing whether the

2    trial court's exclusion of evidence violated the defendant's right to present a defense.

3         Morales, who had been convicted of sexually assaulting a fifteen-year-old relative, argued

4    that his due process rights were denied when the trial court excluded impeachment evidence of

5    the victim's past sexual conduct.  *Id.* at 819.  He sought to introduce evidence purporting to show

6    that in a prior incident, the victim had falsely accused another relative, Valencia, of sexual

7    assault.  *Id.*  In a pretrial evidentiary hearing in Morales' case, however, the victim testified that

8    she had never told her father or the police that she had been penetrated by Valencia's penis, only

9    that she had felt a sharp pain between her legs.  *Id.*  Her father first characterized the assault as a

10    "rape" when he reported the incident to police.  *Id.*  Following an investigation in the earlier

11    incident, the police department concluded that the rape charge against Valencia was

12    unsubstantiated but that the evidence supported another forcible sexual assault, such as

13    penetration by a foreign object.  *Id.*

14         The trial court barred Morales from introducing the victim's sexual history for

15    impeachment purposes, holding that there was insufficient evidence from the prior incident to

16    challenge the victim's credibility.  *Id.*  "[T]he court concluded that even if there was enough

17    evidence, such evidence is at most tenuous and the probative value of such evidence, if any, is

18    minimal and greatly outweighed both by undue consumption of court time and resources . . . and

19    by the public policy protecting the witness from being unnecessarily publicly embarrassed and

20    even savaged by such evidence."  *Id.* (internal quotes omitted).

21         In proceedings concerning Morales' federal habeas petition, the district court held that the

22    state court decision was not an unreasonable application of Supreme Court precedent.  *Id.* at 820.

23    Applying the *Chia* criteria, the court determined that the probative value of the excluded evidence

24    was minimal since the evidence did not support a conclusion that the victim had made a prior

25    false rape accusation.  *Id.* at 821.  In contrast, the victim's testimony about the current allegations,

26    given under oath, was reliable.  *Id.*  The jury was clearly able to evaluate the victim's testimony.

27    *Id.* at 822.  The testimony was neither the only, nor the major, part of the evidence against the

28    petitioner.  *Id.*  Defense counsel was able to cross examine the victim using other examples of

1   past behavior to impeach her testimony and to probe inconsistences between her testimony and

2   various police reports.  *Id.* Evaluating petitioner's claim as a whole, the district court found that

3   Morales failed to carry his burden of proving that the error resulted in actual prejudice.  *Id.*

4        Similarly, in *Duvardo*, the petitioner, who had been convicted of his parents' murders,

5   sought to introduce evidence of three cars parked near his parents' home after the date on which

6   the petitioner was alleged to have killed them.  649 F.Supp. 2d at 1006.  Petitioner contended that

7   the cars were evidence of activity in the home indicating that the victims were then still alive.

8   649 F.Supp. 2d at 1006.

9        The district court concluded that exclusion of evidence concerning the cars did not give

10   the jury a "biased and false view of the evidence."  *Id.* at 1007.  Instead, it found that the state

11   court had properly excluded unreliable evidence.  Because the witness who saw a white car had

12   died, evidence of the white car was properly excluded as hearsay.  *Id.* at 1006.  Evidence of two

13   other cars was properly excluded in the absence of any evidence tying them to the victim's home:

14   no witnesses "saw any person around those cars, or saw any person go from those cars to the

15   victims' house, or had any evidence to make the large leap from the existence of cars in the area

16   of the house to activity in the household."  *Id.* at 1006-07.  In any event, no prejudice arose from

17   exclusion of the very weak car evidence, especially in light of other evidence supporting the

18   alleged date of the victims' deaths, such as mold in the coffee maker two days later, the absence

19   of any internet activity, and the accumulation of mail and messages on the telephone answering

20   machine.

21        **C.     Third-Party Culpability Evidence Excluded in Petitioner's Trial**

22        Applying the established procedure and standards to the analysis of the third-party

23   culpability evidence excluded from Petitioner's trial does not result in a basis for granting habeas

24   relief.

25        **1.     Arteaga's Request to Borrow the Truck**

26        Petitioner argues that the state court wrongly excluded Turner's testimony that Arteaga

27   had asked Petitioner if he could borrow Petitioner's truck on the morning of the burglary.  He

28   ///

1  contends that excluded statement supported a conclusion that Arteaga was driving the truck at the

2  time of the burglary.

3            **a.**     **Trial Court Determination**

4       On May 20, 2010, following the testimony of DNA expert Chantel Giamanco, the defense

5  recalled Tami Turner to testify regarding her activities with Petitioner on the morning of May1,

6  2008. Turner testified that she and Petitioner had risen at about 4:00 or 5:00 a.m. to spray thistle,

7  and returned to the house at about 11:00 a.m. Skavdahl stopped by and stayed for lunch. While

8  Turner, Petitioner, and Skavdahl were sitting outside, Arteaga came by and asked to borrow

9  Petitioner's flatbed truck.

10       The prosecution objected that Turner's testimony of Arteaga's statement was hearsay.

11  The defense argued that the testimony went to "[s]tate of mind. He asked to borrow the truck."

12  RT36 at 9236. The court excluded Turner's testimony as hearsay, adding that if Petitioner

13  himself wanted to testify to the conversation, he could do so.

14            **b.**     **Court of Appeal Analysis**

15       In the direct appeal, the California Court of Appeal analyzed Arteaga's statement under

16  California Evidence Code § 1250, which provided, "in relevant part, that 'a statement of the

17  declarant's then existing state of mind, emotion, or physical sensation (including a statement of

18  intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by

19  the hearsay rule' when offered (1) to prove the declarant's state of mind, emotion, or physical

20  sensation at that time or any other time when it is itself an issue in the action, or (2) to prove or

21  explain acts or conduct of the declarant." *Hughes*, 2013 WL 2103414 at *11 (citing Cal. Evid.

22  Code § 1250(a)(1) & (2)). Explaining that the evidence rule codified the California Supreme

23  Court's holding in *People v. Alcalde*, 24 Cal.2d 177, 187 (1944), the court recited the three

24  elements essential to admission of a declaration of intent to perform an act in the future: (1) the

25  declaration must prove the declarant's intention at the time it was made; (2) it must be made

26  under circumstances which naturally give verity to the utterance; and (3) it must be relevant to an

27  issue in the case. *Hughes*, 2013 WL 2103414 at *10. Petitioner argued that Turner's testimony

28  was within the hearsay exception because Arteaga's statement that he wanted to borrow the truck

1  would allow the jury to infer that Arteaga later drove the truck to commit the burglary.  The court

2  rejected Petitioner's argument because "the proffered evidence did not link Arteaga 'to the actual

3  perpetration of the crime' in this case."  *Hughes*, 2013 WL 2103414 at *12.

### c.     No Violation of Established Federal Law

5  The state court's analysis was reasonable in light of established federal law addressing

6  exclusion of third-party culpability evidence.  As hearsay, the credibility of Turner's testimony

7  regarding Arteaga's request was unreliable.  *See Egelhoff*, 518 U.S. at 42.  In addition, Arteaga's

8  having done nothing more than to ask to borrow Petitioner's truck, the state court could

9  reasonably conclude that the request did not logically prove that (1) Arteaga took the truck

10 without permission or (2) was the individual driving the truck at the time of the Whitla burglary.

11 Further, Petitioner fails to carry his burden of proving that undue prejudice resulted from

12 applying the hearsay rule to bar Turner's testimony about Arteaga's request.  First, Janet Whitla,

13 who knew Petitioner from prior social interaction, saw and identified Petitioner as the individual

14 driving the truck loaded with the Whitlas' property away from the ranch.  Second, Turner's

15 testimony as a whole lacked credibility in that if she immediately followed Arteaga after he left

16 her property with Petitioner's truck and caught up with the truck on the roadside nearby with the

17 Whitlas parked behind it, Arteaga had no time to travel to the Whitlas' ranch, enter it, and transfer

18 the Whitlas' belongings onto the truck.

### 2.     The Earlier Burglary

20 In September 2007, Janet Whitla had not yet cleared personal belongings and furnishings

21 from a house on the Whitlas' ranch in which Janet Whitla's recently deceased mother had lived.

22 One or more unknown individuals entered the mother's home and stole antiques and other

23 personal property.

24 Petitioner was incarcerated in September 2007.  Reasoning that both burglaries had to

25 have been committed by the same perpetrator(s), Petitioner now contends that the state court

26 erred in excluding evidence of an earlier burglary as proof that he could not have been involved in

27 either burglary.

28 ///

### a.     Trial Court Determination

In the course of motions in limine, Petitioner contended that evidence of the prior burglary was admissible under California Evidence Code § 1101(b), to show Skavdahl's motive and common plan to commit both burglaries.  Acknowledging that the Whitlas had seen Skavdahl in Hornitos before returning to their home, Petitioner argued that Skavdahl had not personally entered the home and stolen the Whitlas' property but that he conspired with a third person who actually entered the house and removed the stolen items.  Petitioner argued that Skavdahl was unhappy that the Whitlas had not provided him adequate food and liquor before they left on vacation.  Petitioner accused Skavdahl of having previously "loaned" the Whitlas' ranch tools and equipment to Arteaga, who did not return them.

According to the parties' arguments, the two houses were one-quarter to one-half mile apart on a ranch that is of extensive size and includes multiple other dwellings and outbuildings. The only similarities between the September 2007 burglary and the May 2008 burglary were that (1) entry was gained by prying open the window of a door and (2) a cigarette butt was found in the course of the investigation.  The 2007 burglary was never prosecuted.  The defense asserted that Skavdahl was committing the burglaries and planting cigarette butts to incriminate others.

Characterizing the defense argument as "grasping at straws" (24 RT 5665), the trial court found that neither the means of entry nor the presence of a discarded cigarette butt were sufficiently distinctive to suggest that the same perpetrator committed both burglaries.  The court noted that Janet Whitla identified Petitioner as the driver of the truck loaded with the stolen personal property from her home and that the defense would have ample opportunity to challenge her identification through cross-examination.  The court characterized the defense argument as speculation and conjecture and concluded that introduction of evidence concerning the earlier burglary would unduly consume court time and mislead the jury.  Accordingly, it excluded evidence of the prior burglary under California Evidence Code § 352.[4]

///

---

[4] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Cal. Evid. Code § 352.

1

### b.   Appellate Court Decision

2     In his direct appeal, Petitioner argued that evidence of the prior burglary was admissible

3 under California Evidence Code § 1101(b) to show Skavdahl's motive and common plan to

4 commit the 2008 burglary. After analyzing the two burglaries at the Whitlas' ranch, the appellate

5 court determined that the facts showed "no unique factors in the two burglaries sufficient to

6 support a strong inference they were committed by the same person in accordance with a common

7 scheme." *Hughes*, 2013 WL 2103414 at *15.   The court upheld the trial court's exclusion of

8 evidence of the first burglary, stating: "While the Constitution thus prohibits the exclusion of

9 defense evidence under rules that serve no legitimate purpose or that are disproportionate to the

10 ends that they are asserted to promote, well-established rules of evidence permit trial judges to

11 exclude evidence if its probative value is outweighed by certain other factors such as undue

12 prejudice, confusion of issues, or potential to mislead the jury." *Id.*  (quoting *Holmes*, 547 U.S. at

13 326).

14

### c.   Evidence of Character to Prove Conduct

15     California Evidence Code § 1101(a) provides that "evidence of a person's character . . . is

16 inadmissible when offered to prove his or her conduct on a specified occasion."  Section 1101(b),

17 on which Petitioner relied in his argument to the Court of Appeals, provides:

18
19
20
21
22
> Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

22     In its statutory comments, the Law Revision Commission noted that § 1101 establishes

23 "the general rule that evidence of character to prove conduct is inadmissible in a criminal case,"

24 although it is admissible to establish facts other than the defendant's disposition to commit the

25 crime. For example, evidence of a prior crime is admissible to show the defendant's general

26 criminal plan and absence of accident (*People v. Lisenba*, 14 Cal.2d 403 (1939)); to demonstrate

27 the defendant's sanity and ability to plan and execute a deliberate plan (*People v. David*, 12

28

1    Cal.2d 639 (1939)); or to establish intent by showing defendant's awareness of the outcome of

2    her action (*People v. Morani*, 196 Cal. 154 (1925)).  To the extent that Petitioner sought to

3    introduce evidence of the 2007 burglary to establish that Skavdahl, not Petitioner, committed the

4    2008 burglary, introduction of that evidence looks very much like an attempt to establish

5    Skavdahl's disposition to commit the second burglary.  Petitioner's disclosure during the *in*

6    *limine* hearings that Skavdahl also had a prior conviction for burglary in Madera County adds

7    weight to a conclusion that Petitioner was trying to attribute the 2008 burglary to Skavdahl by

8    establishing a disposition to commit burglary.  The trial court did not recharacterize the burglary;

9    it simply compared the facts of the two burglaries and refused to tie the two burglaries by a

10   common *modus operandi*.

11       "[A defendant] can be tried for no other offense that that (with) which he is charged.  He

12   should not be confronted with attempted proof of other offenses interjected only to prove a

13   criminal propensity that might have led him to the commission of other crimes."  *People v.*

14   *Schader*, 71 Cal.2d 761, 772 (1969) (internal citations omitted).  This general rule reflects the

15   traditional balancing of the probative value of proffered evidence against the probability of undue

16   prejudice.  *Id.*  The existence of a common *modus operandi* between the charged crime and a

17   prior conviction frequently tips the balance towards admissibility.  *People v. Lynn*, 16 Cal.App.3d

18   259, 267 (1971).  Under California law, concluding that two or more offenses demonstrate a

19   common *modus operandi* requires "a comparison of the degree of distinctiveness of shared marks

20   with the common or minimally distinctive aspects of each crime."  *People v. Bean*, 46 Cal.3d 919,

21   937 (1988).  In Petitioner's case, the state court performed the requisite comparison and

22   concluded that the minimal similarities between the 2007 and 2008 burglaries were neither so

23   numerous nor so distinctive as to establish a common *modus operandi*.

24       The state court's performance of an evidentiary analysis under state law is not a matter

25   subject to federal jurisdiction, and Petitioner does not ask this Court to consider the state analysis.

26   Instead, he contends that exclusion of evidence of the 2007 burglary precluded his effectively

27   pursuing his third-party culpability defense.  His argument fall outside of the § 1101 rubric with

28   which he attempted to justify admission of the evidence at trial.

In its application to criminal prosecutions, § 1101 contemplates a prosecutor's use of a prior crime as an element of proof of the criminal offense that is before the court.  In this case, Petitioner seeks to defend against the charges against him by deflecting guilt to Skavdahl, who was neither charged not convicted of the 2007 burglary on the Whitlas' ranch and was not charged in the 2008 burglary with which Petitioner had been charged.

A petitioner cannot transform the exclusion of evidence under a state evidentiary rule into a constitutional error simply by arguing that he was deprived of the right to present a third-party culpability defense.  *Perkins*, 937 F.2d at 1401.  Although the right to present a defense is a fundamental right, in exercising that right, the accused must "comply with established rules of procedure and evidence designed to ensure both fairness and reliability in the ascertainment of guilt and innocence."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The state court's findings that (1) there was minimal similarity between the 2007 and 2008 burglaries, (2) the potential prejudice and confusion of the evidence outweighed its probative value; and (3) that Petitioner retained the ability to effectively challenge Janet Whitla's identification of him through cross-examination implicitly applied the *Chia* analysis.  *See* section VII B above.  In addition, Petitioner's claim that Skavdahl committed both crimes was purely speculative and required acceptance of Petitioner's fanciful argument that, even though Skavdahl was demonstrably not present at the scene of the 2008 burglary, he had enlisted some unknown third party to execute the burglary on his behalf.  The Court should not find a due process violation in the state court's application of its evidentiary rules to exclude evidence of the 2007 burglary.

### 3.     Hearsay Reports of Skavdahl's Statements

During an unrelated colloquy at trial, defense counsel represented that while the Whitlas' caretaker, Rick Skavdahl, was being held in the Mariposa County Jail,[5] he told three or four of other inmates that he knew that the sheriff was pursuing the "wrong guy in this burglary."  30 RT at 7379.  At trial, Skavdahl asserted his Fifth Amendment right against self-incrimination and did not testify.  Petitioner contends that as declarations against penal interest, Skavdahl's statements

---

[5] Skavdahl was imprisoned on a weapons charge unrelated to this case.

to his fellow inmates were exceptions to the hearsay rule.

### a.   Declarations Against Penal Interest

California Evidence Code § 1230 provides a hearsay exception for a declaration against interest.  The rule provides:

> Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render a claim against him by another, or created such a risk of risk making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.

For example, when a murder suspect told a police officer that he had shot a gun but denied shooting the fatal shot, the trial court properly admitted the transcript of that statement as against the suspect's penal interest.  *People v. Brown*, 31 Cal.4[th] 518, 536 (2003).  The California Supreme Court held that by admitting his presence in the victim's stolen truck and assisting his co-defendant in fleeing the scene, the suspect had admitted complicity in the robbery murder, a statement so contrary to the suspect's interests that the statement had to be true.  *Id.*  A statement apparently against penal interest may not be admitted, however, when although facially inculpatory of the declarant, it is also exculpatory, offered to shift blame or curry favor, or when taken in context, has a net exculpatory effect.  *People v. Duarte*, 24 Cal.4[th] 603, 611-12 (2000).  In any event, the § 1230 exception does not apply to evidence of any statement of portion of a statement that is not specifically against the declarant's self-interest.  *People v. Leach*, 15 Cal.3d 419, 441 (1975).

### b.   Trial Court Proceedings

Petitioner subpoenaed Skavdahl to testify at trial, but Skavdahl invoked his Fifth Amendment right against self-incrimination and did not testify.  Petitioner then sought to

23

introduce Skavdahl's statements through the testimony of three jail inmates, Adam Drennan, Dari Russel, and Luis Vasquez. Petitioner argued that each of the three statements was admissible under the hearsay exception for statements against penal interest. The trial court granted the motion only with regard to Adam Drennan, but Petitioner ultimately decided not to call Drennan for tactical reasons. The court found that the statements to Russel and Vasquez did not fall within the §1230 exception because they were not contrary to Skavdahl's personal interest.

> The proffered testimony of Russel was that he heard Skavdahl say "he worked on a cattle ranch somewhere in Hornitos" and "how his boss got ripped off and how some guy that didn't do it was getting blamed and how he was worried also that he, himself might get blamed, for some reason." Vasquez's proffered testimony was that, when the local newspaper came into the jail with a story about appellant's arrest, he heard Skavdahl say "they were going after the wrong guy."

> *Hughes*, 2013 WL 2103414 at *16.

### c.   State Appellate Review

The Court of Appeal upheld the trial court's exclusion of the evidence, agreeing that the excluded statements were not distinctly or specifically contrary to Skavdahl's self-interest. The court explained:

> [T]he statements attributed to Skavdahl were not specifically disserving of his penal interest. He merely expressed an opinion that the police had the wrong person for the burglary without providing any details explaining why this was his opinion. He did not implicate himself in the burglary or in any other criminal activity. Appellant's theory that Skavdahl's statements could *potentially* subject him the criminal liability because he made contradictory statements to the police does not satisfy the requirements of Evidence Code section 1230. The statements were not *distinctly* against Skavdahl's penal interest. Therefore, the court
>
> did not err in finding inapplicable the hearsay exception for statements against penal interest.

> *Hughes*, 2013 WL 2103414 at *16.

### d.     No Due Process Violation

Exclusion from evidence of Skavdahl's statements does not shock the judicial conscience. The Court should not find a due process violation in the state court's refusal to apply the hearsay exception for statements against penal interest.

## D.     Summary and Recommendation

An accused does not have a due process right to introduce evidence of a third party's guilt if the evidence is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.  Each type of evidence excluded in Petitioner's case--Arteaga's request to borrow petitioner's truck, the 2007 crime, and testimony—was incompetent or otherwise inadmissible. Accordingly, the Court should conclude that the state court did not violate Petitioner's due process right to present third-party culpability evidence.

## VIII.   Denial of Self-Representation

In his fourth claim, Petitioner contends that by forcing Petitioner to proceed with appointed counsel, instead of allowing him to proceed pro se, the trial court denied him his Sixth Amendment right to represent himself.  *See Faretta v. California*, 422 U.S 806 (1975).

## A.     State Court Decision

In his habeas petition to the Mariposa County Superior Court, Petitioner raised the issue of the trial court's denial of his right to self-representation for the ten-month period between July 14, 2009, until the beginning of the motions *in limine*.  Acknowledging the advisability of representation by counsel during trial, Petitioner contended that advisory counsel was to represent Petitioner from the inception of the motions *in limine* through the end of the trial.  Before motions *in limine* began, however, Petitioner was to represent himself, and counsel was to act only in an advisory capacity.

Petitioner argued that trial court forced Petitioner to accept the representation of counsel too early.  As a result, Petitioner "had to deal with a full 10 months of conflict with Trial Attorney about how to conduct the case, his worse [sic] nightmares were taking place, the exact problems he tried to avoid by representing himself."  Lodged Doc. 7 at 11-12.  "Petitioner['s] attorney was to be his mouthpiece, nothing else, as was his right to have an attorney for that purpose only."  *Id*.

1   at 12.  As a result of the trial court's appointing his attorney ten months before trial, Petitioner

2   was prejudiced in the matters of "(a) witnesses, (b) admi[ss]ion of crucial evidence, and (c) filing

3   of evidentiary motions."  *Id.*

4         The Superior Court rejected Petitioner's claim as failing to state a prima facie case for

5   relief.  Lodged Doc. 8 at 3.  Petitioner failed to allege and prove specific facts supporting a claim

6   that would merit a grant of habeas relief.  "Conclusory allegations," wrote the court, "do not

7   warrant relief."  *Id.* (quoting *People v. Karis*, 46 Cal.3d 612, 656 (1988)).

8         **B.**      **Procedural and Background Information**

9         A review of the trial record indicates that Petitioner's representation of the proceedings

10   concerning his representation before the trial court was not completely accurate.  Petitioner's

11   desire to represent himself varied from time to time in the protracted course of litigating the

12   charges against him.  The issue of whether Petitioner could competently represent himself

13   ultimately became intertwined with questions of his psychological competence to stand trial.

14         At his arraignment on June 3, 2008, Petitioner advised the trial court that he was

15   considering whether to proceed pro se.  The court granted a continuance to permit Petitioner to

16   consider the issue.  On June 10, 2008, Petitioner declared his intent to proceed without counsel

17   and waived his right to an attorney orally and in writing.  The trial court granted Petitioner's

18   request to represent himself and appointed David Smothers as stand-by counsel and to be

19   available as substitute counsel if Petitioner were later to request representation.

20         After Smothers declared a conflict on August 6, 2008, the trial court relieved him as

21   stand-by counsel and appointed H. Wayne Green as stand-by counsel.  On October 14, 2008, the

22   court granted Petitioner's request to appoint Green as advisory counsel so that he could

23   participate in the proceedings with Petitioner.  Thereafter, Green participated actively in pretrial

24   matters.

25         On June 25, 2009, Green advised the trial court that Petitioner did not intend to represent

26   himself at trial.  Petitioner did not disagree.  Trial was scheduled to begin on August 11, 2009.  At

27   the readiness conference on July 14, 2009, following colloquy with the trial judge and in Green's

28   absence, Petitioner elected to have Green represent him at trial.  Petitioner appeared without

Green on July 16, 2009.

When Green was substituted as attorney of record on July 21, 2009, he advised the trial court that he was not ready for trial as scheduled. The court continued the trial to November 10, 2009.

At a hearing on October 16, 2009, the court addressed Petitioner's jail behavior and plans for courtroom security plans during trial. Petitioner confirmed his ability to communicate with Green. On October 26, 2009, however, Petitioner filed a motion asking the trial court to reinstate his waiver of counsel and allow him to proceed pro se. Petitioner contended that his medication was effective and he was able to control his emotions. He requested that Green be designated advisory counsel or co-counsel to expedite pretrial proceedings and cross-examination, although Petitioner intended to retain the ability to introduce evidence and cross-examine witnesses.

On November 2, 2009, Petitioner filed a written withdrawal of his request to proceed pro se and asked to be appointed co-counsel with Green, who would serve as lead counsel. Petitioner wished to retain only the limited ability to give statements and assist in presentation of his defense.

The next day, November 3, 2009, after Green questioned Petitioner's competence to stand trial, the court suspended proceedings and ordered evaluations of Petitioner's competency. In an outburst at the end of the hearing, Petitioner called the trial judge a "fucking liar." (On November 5, 2009, Petitioner filed a written apology.)

On December 7, 2009, Petitioner filed a written motion requesting permission to assist Green in preparing for trial. The trial court reserved ruling on the motion.

Neuropsychologist Howard J. Glidden, Ph.D., opined that Petitioner was competent to stand trial. Petitioner required medication to control behavioral dyscontrol/disinhibition, lack of impulse control, and attention deficit-hyperactivity disorder.

Psychologist Andrew Neufeld, Ph.D., concluded that due his egocentric thinking and inability to tolerate frustration, Petitioner could not conduct his own defense in a rational manner. Dr. Neufeld explained that Petitioner lacked the ability to understand the position of another person and reflexively disagreed with anyone whose opinion was contrary to that of Petitioner.

1  Because Petitioner was impulsive and unpredictable, he presented a danger of harm to himself

2  and others.

3      Psychologist Phillip Hamm, Ph.D., agreed with Dr. Neufeld that, as long as he was

4  properly medicated, Petitioner was competent to stand trial and to assist counsel in his own

5  defense. Petitioner's mental disorders precluded his representing himself, however. Notably,

6  Petitioner displayed a mood disorder (bipolar personality disorder) and an impulse control

7  disorder. He was grandiose, controlling, manipulative, distrustful, and suspicious. Without

8  medication, Petitioner was "more out of control, impulsive and aggressive, and would be unable

9  to participate rationally at trial." 12CT at 3117. Dr. Hamm reported that Petitioner was angry

10 toward jail and law enforcement personnel and sought retribution.

11     On January 19, 2010, after reviewing the psychological evaluations, the trial court found

12 Petitioner competent to stand trial, but not to represent himself. Nonetheless, Petitioner again

13 sought to represent himself, arguing that Green lacked sufficient time to handle the case. Green

14 responded that Petitioner was disappointed that Green had not filed motions while the case had

15 been suspended for Petitioner's competency evaluation.

16     The Court denied Petitioner's request to represent himself and to file his own motions. It

17 concluded that although Petitioner was competent to assist counsel, he could not represent

18 himself because his inability to control his violent outbursts prejudiced his case. Green agreed

19 that Petitioner could speak with the investigator about what needed to be done before trial. The

20 court set a trial date of March 22, 2010.

21     When court convened for *in limine* hearings on March 18, 2010, Petitioner was extremely

22 agitated regarding medication issues. When Green met with Petitioner during a break, Petitioner

23 exploded in rage, throwing chairs onto a table.

24     On April 16, 2010, the trial court ordered Petitioner transferred to the custody of the

25 California Department of Corrections and Rehabilitation after his disruptive behavior caused

26 safety and security issues at the Mariposa County Jail. Petitioner was placed under a suicide

27 watch after he stated his intent to stick glass into his eye to relieve the pressure in his head.

28 ///

On April 26, 2010, the trial court received a rambling eight-page letter from Petitioner dated April 12, 2010.  The court also received a two-page letter in which Petitioner asked to appear briefly in court for the jury to see him before having his medications adjusted for trial.

### C. Waiver of Right to Counsel

"[U]nder the sixth amendment a criminal defendant has the right to waive his right to counsel and represent himself, provided that he knowingly, intelligently, and voluntarily elects to do so." *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990).  "The sixth amendment's guarantee of assistance of counsel is unusual among constitutional rights in that it is also implicitly a guarantee of its opposite, the right to refuse counsel." *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989) (citing *Faretta*, 422 U.S. at 819).

Although the sixth amendment right to assistance of counsel is automatic, a defendant "must negotiate a number of procedural obstacles" to exercise his right to self-representation. *Adams*, 875 F.2d at 1444.  "Because a defendant normally gives up more than he gains when he elects self-representation," a district court must be "reasonably certain that he in fact wishes to represent himself." *Id.*  There is a presumption against the waiver of constitutional rights, and a waiver is not effective unless an "intentional relinquishment or abandonment of the known right or privilege" is established. *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). *See also Brewer v. Williams*, 430 U.S. 387, 404 (1977).

In the Ninth Circuit, a district court makes this determination by considering whether the waiver of the right of self-representation was (1) unequivocal, (2)  knowing and intelligent, and (3) voluntary. *Robinson*, 913 F.2d at 714-15 (citing *Faretta*, 422 U.S. at 835).  The court must also determine that the waiver is timely and not made for the purpose of delaying the proceedings. *United States v. Smith*, 780 F.2d 810, 811 (9th Cir. 1986).  Whether a defendant waived his right to counsel is a mixed question of law and fact. *Harding v. Lewis*, 834 F.2d 853, 857 (9th Cir. 1987).

The right of self-representation is not absolute. *Martinez v. Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 163 (2000).  When a defendant has been found mentally competent to stand trial when represented by counsel but not mentally competent to conduct his

29

own defense, the Constitution does not prohibit a state from insisting that the defendant be represented by counsel. *Indiana v. Edwards*, 554 U.S. 164, 167 (2008).

Here, three mental health professionals evaluated Petitioner and found him competent to stand trial. In addition, two of the experts opined that Petitioner was not competent to represent himself, providing detailed explanations for their conclusions. Combined with a procedural history that indicated Petitioner's ability to work with his counsel, his acknowledgement of counsel's superior ability to represent Petitioner from motions in limine and trial, and Petitioner's varying positions concerning the role he himself wanted to play in his trial representation, the state court acted reasonably in concluding that Green would represent Petitioner at trial.

## IX.   Ineffective Assistance of Counsel

Petitioner contends that his Sixth Amendment right to effective assistance of counsel was violated when Green failed (1) to introduce evidence of local ordinances to preclude introduction of his jailhouse confession at trial; (2) to call Petitioner to testify at trial; and (3) to object to Donato's inability to identify Petitioner at trial.

### A.   Standard of Review

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorneys' representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698.

///

1    These elements need not be considered in order. *Id.* at 697.  "The object of an

2    ineffectiveness claim is not to grade counsel's performance." *Id.*  If a court can resolve an

3    ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's

4    performance was deficient. *Id.*

5        The scope of federal habeas review of a claim of ineffective assistance of counsel is

6    narrow. *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000).  A habeas petitioner has the burden of

7    proving that the state court applied the *Strickland* standard in an objectively unreasonable

8    manner. *Bell v. Cone*, 535 U.S. 685, 699 (2002).

9        To prove that an attorney's performance was deficient, a petitioner must establish that

10   counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at

11   688.  This requires the petitioner to identify the acts or omissions that he alleges were not the

12   result of reasonable professional judgment. *Id.* at 690.  In a federal habeas action, the court must

13   then determine whether considering the facts and circumstances as a whole, the identified acts or

14   omissions were outside the range of competent and professional legal assistance. *Id.*  "We

15   strongly presume that counsel's conduct was within the wide range of professional assistance, and

16   that he exercised acceptable professional judgment in all significant decisions made." *Hughes v.*

17   *Borg*, 898 F.2d 695, 702 (9th Cir. 1990).

18       The standard for reviewing counsel's performance is "highly deferential." *Strickland*, 466

19   U.S. at 689.  "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to

20   reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

21   counsel's perspective at the time." *Id.*  The petitioner must overcome the presumption that the

22   challenged behavior constituted "sound trial strategy." *Michel v. Louisiana*, 350 U.S. 91, 101

23   (1955).  "The object of an ineffectiveness claim is not to grade counsel's performance."

24   *Strickland*, 466 U.S. at 697.

25       **B.    State Court Determination**

26       Petitioner presented his ineffective assistance of counsel claims in his habeas petition to

27   the Mariposa County Superior Court.  Characterizing Petitioner's claims as conclusory, the court

28   denied the petition for failure to state a prima facie claim for relief.  The Court of Appeals and the

California Supreme Court summarily denied the petition.

### C.   Introduction of Local Ordinance Governing Sheriff's Reports

As his fifth ground for habeas relief, Petitioner contends that counsel failed to represent Petitioner effectively when he failed to introduce evidence of Mariposa County Sheriff's Department rules in the course of the hearing to suppress Petitioner's blurted confession to a jail guard. Petitioner adds that counsel erred in failing to file a writ of prohibition after the trial court erroneously admitted Petitioner's statement.

### 1.   Procedural and Factual Background

Just before trial, on March 18, 2010, the prosecutor gave defense attorney Green the report of Jail Officer Freitas concerning a statement made to him by Petitioner:[6]

> While performing a routine cell check in C block, I notice[d] [Petitioner] was working on some paper work.
>
> I asked [Petitioner] if he was working hard on his criminal case again. He said he was.
>
> He proceeded to tell me that the whole case is bullshit and should be thrown out. He said the only reason he fled the scene is because he thought the deputies were trying to kill him.
>
> He said when the back window of the truck shattered, he thought the deputies were shooting at him.
>
> He also said that the neighbor had seen him leaving the house.
>
> I did not ask [Petitioner] any questions about the criminal case.
>
> 22 RT 4963-64.

The prosecutor and Green agreed that the statement required a Rule 402 motion with a hearing outside the presence of the jury. The defense later submitted a motion to exclude the statement under California Evidence Code § 352, contending that the statement was unlawfully elicited by Officer Freitas and violated Petitioner's 5th, 6th, and 14th Amendment rights to counsel, to remain silent, and to due process.

The trial court conducted the R. 402 hearing on April 5, 2010. Petitioner, who reportedly was not receiving his psychotropic medications, first declined to be present, then attended after

---

[6] The report was in the form of an e-mail from Freitas to his superior, Captain Bibby.

32

1    proceedings were postponed until the afternoon.

2                        **a.       Jail Officer Freitas' Testimony**

3            Officer Freitas testified that he began working in the Mariposa County Jail in February

4    2010.  On March 11, 2010, Petitioner, who was the sole occupant of F block,[7] which contained

5    two cells, was in the common area of the cell block doing paperwork.  Freitas recognized that

6    Petitioner was doing legal work because he was using his box of legal property.  Freitas knew

7    what the legal property boxes looked like because jail officers are not permitted to search them.

8    Although Freitas was unfamiliar with the case in which Petitioner was involved, Freitas assumed

9    that Petitioner was working on his case and asked if he was working on it.  Freitas' intent was

10   simply to make small talk and build rapport with Petitioner.  Freitas knew that Petitioner was

11   represented by counsel and had seen Petitioner leave for conferences with his attorney.

12           Petitioner replied affirmatively and stated that he thought deputies were shooting at him

13   when the back window of the truck shattered and that the neighbor had seen him leaving the

14   scene.  Not understanding that the conversation had any significance, Freitas took no further

15   action.  (Freitas testified that he kept a log of his hourly cell checks on which he noted anything

16   unusual he encountered during a routine check.  Because he did not consider the conversation

17   significant, he did not note it on the log.)

18           About an hour later, Officer Mirelez, who had investigated the crimes with which

19   Petitioner was charged, stopped by the jail.  In the course of an informal conversation about how

20   Petitioner was doing, Freitas recounted some of what Petitioner had said in the earlier

21   conversation.  At that time, Mirelez did not tell Freitas that the statement was significant or advise

22   Freitas to document the conversation in writing.

23           About a week later, Captain Bibby asked Freitas to submit a written report of the

24   conversation.  After Freitas spoke with Bibby, Mirelez called Freitas to encourage him to submit

25   a written statement and told him the statement could be important.  Freitas then sent the e-mail

26   regarding Petitioner's statement.

27   ///

28   _____
     [7] Freitas testified that his statement incorrectly referred to C block.

                                                    33

Freitas denied that he had intentionally attempted to get a statement from Petitioner regarding the case.  On cross-examination, Green asked Freitas if he had read the jail's policy and procedures manual as part of his orientation to his new job.  Freitas testified that he had.  In response to further cross-examination, Freitas testified that he was aware the Petitioner was in administrative segregation; had experienced problems in jail, including outbursts and acting on impulse; and took various medications.  He testified he distributed the medications to prisoners.  Petitioner told Freitas that without his medication, his outbursts were worse.  Freitas had no personal difficulties with Petitioner.

Freitas testified that the jail officers did not read the police reports and were not briefed about the investigations of the prisoners being held in the county jail.  Although the jail records indicate the charges against each prisoner (e.g., burglary), the records do not provide any underlying facts.  Although Freitas was aware that Petitioner had been charged with burglary, he had never asked Petitioner why he was in custody.

### b.   <u>Officer Mirelez' Testimony</u>

On March 11, 2010, Sheriffs Deputy Rudy Mirelez went to the county jail to speak to someone on an unrelated matter. While Mirelez waited for the person that he had come to see, he sat in the control room with Officer Freitas.  From the control room, Mirelez could see Petitioner watching television in his cell.  To pass time, Mirelez asked Freitas how Petitioner was doing and whether Freitas had been able to get along with Petitioner.  Freitas replied that he had good rapport with Petitioner and that they were able to talk.  In the course of their conversation, Freitas mentioned Petitioner's statement regarding the broken truck window and his fear that the officers would kill him.  Although Mirelez recognized the statement to be potentially incriminating, he did not inform Freitas that the statement was significant nor share with Freitas any information about the incident underlying the charges pending against Petitioner.

Mirelez had four days off.  When he returned to work on March 17, 2010, he spoke to the district attorney about his concerns.  Thereafter, Mirelez prepared a written report.

Green cross-examined Mirelez regarding his failure to prepare a written report before leaving work on March 11, 2010.  Mirelez acknowledged that he had not written a report of the

34

statement until a week after he spoke with Freitas.

Mirelez, who was the first officer on the scene, confirmed that the back window of Petitioner's truck was shattered, but still in the frame, when Mirelez arrived. No deputies arrived before Mirelez, nothing about the shattered window suggested that it had been hit by gunfire. Having been told that the truck had made a u-turn on Indian Gulch Road, which is a well-used and very bumpy old road, Mirelez assumed that the tempered glass window shattered upon impact with one of the items loaded on the truck bed, but Petitioner heard only the sound and misconstrued it to be gunfire. In Miralez' opinion, a shot from any weapon carried by a sheriff's officer would have blown out the window, not left it within the window frame. Miralez noted that his photographs of the truck showed a yard umbrella wedged between the flatbed and the cab which could have struck and broken the window.

### c.     Trial Court Analysis

Following argument by both parties, the trial court denied Petitioner's motion to exclude his statement. The court rejected the defense argument that Officer Freitas had intentionally sought to extract information from Petitioner in an appropriate manner. The court found no indication that Freitas had any appreciation of the gravity of Petitioner's statement. The court also rejected the possibility that Petitioner had intentionally made the statement to disrupt the trial, noting Petitioner's chatty nature and his tendency to disclose more than his attorney might find appropriate. In short, the court found the conversation between Petitioner and Freitas to have been "idle chitchat." 24 RT 5609.

Although establishing a context to enable the jury to understand the statement would require time, in the trial court's estimation, the time would not be inordinate. Accordingly, the trial court determined that Petitioner's statement to Freitas was admissible.

### 2.     Failure to Introduce "Mariposa Sheriffs Office Ordinances"

Denying that he ever made the statement attributed to him, Petitioner contends that Freitas and Mirelez "broke the law" by failing to follow the Mariposa Sheriffs Office Ordinances.[8]

---

[8] According to Respondent, Mariposa County Sheriff's Department General Order 93-20 requires officers to complete and enter a report within 24 hours of an incident. Doc. 22 at 43.

Petitioner contends that, by failing to introduce the ordinances as an affirmative defense at the suppression hearing, Green ineffectively represented him. Petitioner does not explicitly address either element of the *Strickland* analysis.

As already noted, the superior court dismissed this claim as meritless. Petitioner's conclusory seven-sentence federal claim provides no further basis for this Court to conclude that Green's failure to introduce the ordinances themselves fell below an objective standard of reasonableness or resulted in prejudice to Petitioner.

The timing of the officers' reports was not directly at issue at the suppression hearing. Timing was relevant only as a factor in the court's determination of the statement's credibility. Significantly, Green's cross-examination forcefully focused on the failure of Deputy Mirelez, the only officer who fully understood the statement's relevance to the charges pending against Petitioner, to file a written statement until he returned to work nearly a week after Freitas disclosed Petitioner's statement. Green repeated several times the violation of sheriffs department practices and policies inherent in Mirelez' delay; Mirelez did not disagree that his report was not timely. Similarly, Green emphasized the likely effect of delay on the detail and accuracy of the report of the incident; Mirelez did not disagree.

If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697. Even in the unlikely event that the trial judge did not appreciate the negative implications of the delayed reports, Green articulated deputies' misfeasance fully, even if he did not argue or introduce into evidence the Mariposa County ordinance itself. As a result, there is no reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See id.* at 688, 694.

### D.       Failure to Call Petitioner to Testify

Petitioner contends that after he was forced to accept representation by counsel, Green waived Petitioner's rights without consulting Petitioner, particularly Petitioner's right to testify on his own behalf. He argues that Green's failure to call Petitioner to testify constituted ineffective assistance of counsel contrary to the 5th, 6th, and 14th Amendments to the U.S. Constitution. In

the state habeas action, the Mariposa County Superior Court denied this claim as lacking merit.

### 1.    Right to Testify

The Fourteenth Amendment secures a criminal defendant's right to choose between remaining silent and testifying in his own behalf.  *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987); *Ferguson v. Georgia*, 365 U.S. 570, 602 (1961).  A right to testify has also been found in the compulsory process clause of the 6th Amendment, which grants criminal defendants the right to call "witnesses in his favor."  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *Washington*, 388 U.S. at 17-19.  *See also Faretta*, 422 U.S. at 819 (recognizing that the 6th Amendment gives a criminal defendant the right to speak personally in his own defense).  The Court has also held that a defendant's right to testify may be derived from the 5th Amendment's guarantee against compelled testimony.  *Harris v. New York*, 401 U.S. 222, 230 (1971).

Because the right to testify is personal, only the defendant can relinquish the right. *United States v. Edwards*, 897 F.2d 445, 446 (9th Cir. 1990.  A defendant's relinquishment of his right to testify must be knowing and intentional.  *Edwards*, 897 F.2d at 446.  Nonetheless, the right to testify is essentially "a strategic trial decision with constitutional implications."  *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir. 1993).  Accordingly, under *Edwards* (897 F.2d at 446-47), a defendant is "presumed to assent to his attorney's tactical decision not to have him testify." *Joelson*, 7 F.3d at 178.

Waiver of the right to testify may be inferred from the defendant's conduct and is presumed from a defendant's failure to testify or notify the court of his desire to do so.  *Edwards*, 897 F.2d at 446 (citing *Martinez*, 883 F.2d at 760).  At trial in this case, Petitioner neither insisted on testifying, spoke to the trial court, nor sought to discharge Green based on Petitioner's determination not to waive his right to testify.

### 2.    Ineffective Assistance of Counsel

In arguing that trial counsel should have permitted Petitioner to testify at trial, Petitioner contends only that he would have been able to testify to unspecified evidence promised, but never provide, in defense counsel's opening argument.  He fails to carry his burden of proving ineffective assistance arising from Green's tactical decision not to put Petitioner on the stand.

Petitioner's barebones argument is inadequate for the Court to determine whether counsel's decision not to have Petitioner testify "fell below an objective standard of reasonableness," or whether "there is reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. As a result, the Court should conclude that the state court acted reasonably in concluding that Petitioner's contention lacked merit.

### E.   Counsel Did Not "Object to" Witness' Failure to Identify Petitioner

In his ninth claim, Petitioner complains that Green's assistance was ineffective because Green failed to "object to" Lillian Donato's failure to identify Petitioner at trial. Petitioner raised this claim in the Mariposa County Superior Court, which characterized the claim as lacking merit.

### 1.   Factual Background

Lillian Donato testified that after meeting each other about ten years earlier, she and Tami Turner became friends. When Donato became sober about 18 months before trial, however, Turner kept drinking, and their friendship ended.

Donato met Petitioner only once, while she was still drinking heavily. Turner and Petitioner came to Donato's home, ostensibly to pick out a kitten. Donato did not know that Petitioner was a burglary suspect. Turner showed Donato a photograph and offered Donato a 24-pack of beer if she would tell an investigator that she saw the individual in the photograph getting out of Petitioner's truck in Hornitos. For two years, Donato told investigator Cahoone and attorney Green that she had seen the pictured individual driving Petitioner's truck. Eventually, Donato spoke with her pastor, who encouraged her to tell the truth.

At the time of her trial testimony, Donato had been taking Geodon and Remeron to stabilize her paranoid schizophrenia for about fifteen years. When Donato took these medications, she did not hear voices or feel suicidal as she had felt before she took them. She had also been diagnosed with diabetes, high cholesterol, leukemia, and bone marrow disease. Until her recent sobriety, she had been drunk every day for 22 years. She drank from the time she awakened until she passed out.

///

On cross-examination, Donato testified that she recognized investigator Cahoone and barely remembered Green.  She remembered some, but not all, of their respective visits to her. She told Green, "[Y]ou told me to tell you the truth and I told you what Tami told me to say."  35 RT 8874.  Although Green aggressively questioned Donato, she was unable to recall all of the details that she told Green and Cahoone.

### 2.      Objecting to Donato's Testimony

When considered in the typical understanding of an objection in litigation, characterizing counsel's ineffective assistance to have been his failure to "object to" Donato's failure to identify Petitioner makes little sense.  In common terms, objecting to an item of evidence suggests that it should be excluded from evidence as somehow inadmissible under applicable rules of evidence. In that sense, Green had no basis to "object to" Donato's testimony.

The claim emphasizes Green's failure to impeach Donato's testimony using prior, unspecified, inconsistent statements.  Because Petitioner has not specified the prior statements nor provided them to the Court, it cannot determine whether Green actually omitted some prior statements.  The record sets forth  persistent and probing cross-examination in which Green attempted to demonstrate that Donato had made prior statements and that she lacked credibility.

In the end, Petitioner failed to carry his burden of proving that Green's representation was ineffective because Green failed to question Donato about prior inconsistent statements.  The state court acted reasonably in rejecting this claim as lacking merit.

### X.      Possible Monitoring of Petitioner's Meetings With Counsel

In his sixth claim, Petitioner contends that his meetings with counsel in the Mariposa County Jail were "monitored and capable of being recorded."  Doc. 1 at 24.  According to Petitioner, after he filed a grievance on January 14, 2010,  prison officials took action to ensure Petitioner's privacy.  Nonetheless, he contends:

> 1.      Respondent's Investigator, whose son worked for the jail, had sole access and capability to monitor and record legal visits.
>
> 2.      The predominate [*sic*] Judge, who made numerous rulings on Petitioner's case, also has a son who had sole access and capability to monitor and record legal visits.

3.      After the numerous visits between Petitioner and his investigator, Petitioner would send investigator to Respondent's only eye-witness, who would subsequently alter her descriptions and story in response to the tactical strategy developed by the defense team after discussing her weaknesses.  By the time for trial, and cross examination, the witness had a whole new way to being able to recognize Petitioner.  This greatly affected Petitioner's trial, and was used to convict petitioner.

4.      Petitioner also had numerous witnesses who were in custody, and all of those visits were capable of being monitored and recorded by Sheriff Deputies.

Doc. 1 at 24.

### A.      Procedural and Factual Background

On January 13, 2010, Lt. Susan Brent of the Mariposa County Sheriff's Department responded to various complaints lodged by Petitioner.  In paragraph 2, Brent stated, "We will not allow your attorney nor anyone else to turn off our intercom system."  Lodged Doc. 14.  On January 14, 2010, Petitioner filed an emergency grievance seeking sound restriction of the attorney interview room.  The Sheriff's Department enacted the following remedy:

When you are meeting with your attorney in the Attorney Conference Room the speaker in the public visiting room will be turned off and all phones hung up by Jail Staff.  If the visiting room is in use or will be used during your attorney visit the speaker will be reactivated by the Jail Staff and you and your attorney will be notified, before the speaker is activated.

Lodged Doc. 16.

Petitioner raised this issue in his state habeas petition.  The Mariposa County Superior Court denied the claim as conclusory and lacking merit.

### B.      Conclusory and Speculative Claims

Petitioner has alleged no factual basis to support a conclusion that Mariposa County Jail personnel monitored, or recorded, or used or permitted anyone else to use, the content of Petitioner's conferences with his attorney.  His claim alleges only that before institution of the department's remedy on January 14, 2010, prison officials had the ability to monitor and record conversations in the attorney interview room at the Mariposa County Jail.  Petitioner's contention that prosecutors obtained records of Petitioner's conversations with his attorney and used them to convict him of the Whitla ranch burglary is mere speculation.

40

Granting federal habeas relief on the basis of mere speculation with little or no support upsets the delicate balance between the federal courts and the states. *Wood v. Bartholomew*, 516 U.S. 1, 6, 8 (1995). Conclusory allegations unsupported by specific facts do not warrant federal habeas relief. *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970). The Court should not consider this claim.

## XI.    Cumulative Error

In his tenth claim, Petitioner contends that the Court should grant him habeas relief based on cumulative error. Because no error is apparent in any of Petitioner's grounds for relief, no basis exists for a finding of cumulative error.

## XII.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

41

1

2

        (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

3

4

5

6

7

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

8

9

10

Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his  . . . part." *Miller-El*, 537 U.S. at 338.

11

12

13

14

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Accordingly, the Court declines to issue a certificate of appealability.

15

**XIII.**   **Conclusion and Recommendation**

16

17

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

18

19

20

21

22

23

24

25

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District

26

///

27

///

28

42

Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **June 27, 2016**                              /s/ *Sheila K. Oberto*
                                                         UNITED STATES MAGISTRATE JUDGE

43